May it please the court, Dean Stewart from San Clemente, California, representing Mr. Olotoa, and I'd like to reserve two minutes, if I may. All right, I'll try to help you watch the clock. Thank you. I'd like to start by talking about Zorro the dog, not Simon from the last case, but Zorro in this case. Zorro, right. And it comes back to the Harris case that was discussed in the last case as well, and I would submit that the Harris case requires the court to look at three things, training, certification, and what actually happened or in the field work. In this case, in the Olotoa case, it appears that all three of those are woefully lacking, starting with the training. As we found out in the motions hearing, training the log for it is, in Judge Kobayashi's opinion, not useful, because every time Zorro would go out to train, each entry in the log, every last one of them says he found whatever it is they were looking for. It was only after cross-examination that we found out that the dog would oftentimes miss whatever the dog was looking for, Zorro was looking for. They'd hide it somewhere else, and he may or may not find it then, and if he didn't, they'd hide it again. So he missed perhaps three different times, and the logs say he found what he was looking for, each time, each entry, for years. But counsel, isn't it true that maybe Hawaii's procedures were less than accurate, but there were two other groups. Zorro was certified by the California Narcotics Canine Association and the American Working Dog Association. Even assuming Hawaii's canine certifications are suspect and unreliable, doesn't Zorro's certification by these other two groups tend to say that he was reliable? No, Your Honor, and the reason why is apparent in the American Working Dog certification, as an example. Judge Kobayashi asked the witness, which I think was Deputy Silva, he's asking you, are there any other certifications for Zorro besides this booklet that has its passport like with stamps? The witness says it would be the in-house certification from the state, which is the certification that no one ever flunked, ever, in 21 years. No dog ever flunked it. And also, I guess with the American Working Dog, they'll just send us a certificate in the mail. So if you pass the in-house state certification, at least the American Working Dog, they just send you a certificate. It doesn't say anything. There's no evidence that there was specific testing, monitoring, whatever it would take. It's like in the old days, you'd mail in for your box top from Corn Flakes to get a membership in some kid's club. It's the same idea with this particular one. The certification itself, as we heard, no dog had ever failed. So for example, they could have taken, the deputies could have brought in a pug and a chihuahua and wanted to get them certified. And eventually, those two dogs would be certified. It might take years for that to happen. But because there was never once one that flunked, the certification is, I would say, it's far less than simply not as good as in the mainland. Well, my question was, I was reading your brief, and from reading it, I only see this challenge to the Hawaii certification as being pointless and hollow. But I don't see a challenge to what you're now talking about. You may have argued in the district court, but I didn't see it in the Court of Appeals. So maybe I missed it, and you can point me where in your brief. But I didn't see it. I wish I could point you to it, Your Honor. Maybe it's just not there? Maybe I didn't address it. I think it's still there because it was in the record down below. But in any event, where that leaves us is with really no way to judge training at all. There's some statements by Silva about we did this and we did this. But the point of the log is so that now the defense, the court, everyone can come back and look at what the training was all about. We don't have that in this case at all. And of course, I would suggest that is of critical importance, and that by itself is enough to erode the probable cause in this case. Then you take this strange Orwellian certification process where you just keep putting the dog in there, and eventually he passes. Is that as a matter of law? Are you saying that a certification is no good unless they can show that some dogs flunk the test? Is that what you want us to write in an opinion? Yes, and it's more common sense that it is anywhere in particular. Florida v. Harris talks about the totality of the circumstances, and this is one of them. There is a process that gives you a certification, but the process to get there is... Wouldn't you have to show that there were dogs who were not qualified, who had been certified, rather than just saying that they certified them all? Because that could mean, well, they brought in dogs who were good sniffers. And I question the handlers. I think I talked to three different people about that issue, and at no point did they say that there were dogs that washed out, flunked, or anything. Everybody that went into that system got certified, and that's my point. That's why it's so odd and unusual. But you're talking only about the Hawaii system, aren't you? Correct, and that's all that matters in this case. Well, if he was certified by the California Narcotics Canine Association and the American Working Dog Association, why isn't that sufficient? It isn't sufficient because we don't know anything about California and the way they do it. I would note that the same people that are involved in the in-house Hawaii certification are also involved in this California state one, and that's Mr. Lackadance. But if we had that evidence... I'm sorry? If we had that in the briefs, then we would be benchmarking it against that evidence. Instead, I'm looking at the district court's footnote on that point about the California Narcotic Canine Association, etc. But the district court also didn't have the ability to make that judgment without the evidence. Well, I would say that the burden was on... Was there any affidavit or otherwise? Well, you have a certification which, whether it's a useless piece of paper or not, that's presented, and isn't it the defense's obligation to knock holes in that certification if you don't accept it? And we tried to do that as best we could in the motions hearing, and the record is what the record is. All right. Finally, and I will agree that from the last case, in Harris, the actual performance in the field is the least of the three considerations. But here, this dog's performance in the field was not good at all, as indicated by his own handler, who sent an email to the assistant U.S. attorney saying that his record is less than perfect. When we look at his actual logs, he had 16% error rate, if you will, and under those circumstances and the other factors that I cited in the brief, I would suggest that his infield performance is also exceptionally poor. The Harris court talked about, in their words, the sniff is not up to snuff. That is our entire point here. It wasn't, and therefore, the probable cause was lacking, and the warrant should not have issued. Counsel, I'd like to ask, what evidence is there in the record that the officers expressly or impliedly promised Olatowo leniency in exchange for his cooperation? I wish I had the citation, Your Honor. It is in the record. It was conceded by the agents that they would, at a minimum, bring to the attention of the prosecution and the court his cooperation. But I would suggest that on that issue, it's clear that he was given the choice. Either you go to jail and you go to Hawaii right now in custody, or you cooperate and you go home. Our suggestion is that that's a threat, that's pressure, that's coercion, and that's what the defendant testified to in the hearing. Do you have any case supporting your argument? Case supporting the argument? Again, this is a totality of the circumstances situation, so I don't think we can pick that one particular item out. It's the entire environment that the agents set up, including things like the long ride up to Los Angeles, the strong-arm arrest. All of it together as a totality indicates that he was pressured. Although you said in your brief that this issue of questioning in the car between when he was picked up and brought downtown is not an issue. Well, the questioning wasn't. It was the length. They went from Costa Mesa, California, to downtown LA, the Roybal building, when they could have gone to Santa Ana, which is like three or four miles from Costa Mesa. Our argument is that they specifically chose the longer way to go in order to give them more chance to work on him, to let him stew in what was going on. What would it matter if they drove to San Francisco if the questioning wasn't at issue? Well, it just adds to the coercion, so that the time they get to Los Angeles, he's softened up. I see your point. I'm sorry I've gone beyond my time. Thank you. Aloha and good morning. My name is Chris Allen Kuma'o Thomas. I'm Assistant U.S. Attorney for the United States. Your Honor, I think it needs to be cleared up in terms of putting this phrase into context about all of the dogs that were tested were certified. I think it's important to note that in the affidavit that was attached to the search warrant that the judge reviewed, which was not included in the defendant's records, but was in the government's supplemental record, it points out just the type of training that these dogs must go through before they're even subjected to the certification process. As set forth in that affidavit, it sets out that this dog in particular had to go over 190 hours of training prior to the certification process. This dog had also gone through 80 hours of additional training from the Honolulu Police Department K-9 unit prior to being subjected to the certification process. These K-9 officers, that is their sole police function. They are handlers of these dogs. These dogs that are employed, in this case by the Honolulu Sheriff's Department, that is their sole function. Their reason for their existence is to perform and to identify, locate, and help in the seizure of these narcotics. That's their sole purpose. These dogs, they are not pugs. They do not acquire them from the local dog pound or the Hawaii Humane Society. As set forth in the record, this dog, Zorro, was obtained from Holland, a Belgian shepherd, thousands of dollars. The initial training occurred there. On the record, Sheriff Russell Silva stated that he has to give the commands in Swedish because of the initial training that this dog received. These dogs... You're not suggesting because you speak Swedish, you're a smarter dog, right? No, just because that's how the dog was initially trained. Here's the point. He speaks Dutch and Swedish, perhaps. But the point was that the dog never fails, right? Correct. Well, but it's like a kid taking a test. You fail the test and you say, okay, well, you failed that test. Here, I'm going to give it to you again. And people learn, and then ultimately they keep trying and trying and trying. They say, oh, he never failed a test. So there is something a little suspect about the way they report the statistics, is there not, in terms of reliability? Well, the government is just trying to put it into context, Your Honor. Also, as Judge Nelson pointed out, there were three certification agencies. I'm just now talking about the Hawaii sort of, you know, don't worry if you fail, we'll give you one, two, three, four more chances. Yeah, well, there is testimony on the record that if a dog were to fail, there was a time period where there was waiting, there was additional training, the dog would have to test again. And in those instances, there were no failures because eventually the dog would be certified. But the point that the government is trying to make is that these narcotic dog handlers, this whole program, they know that they're going to be subjected to scrutiny. They know because they have to keep all these records of the training, exactly what date, how long, what type of training, what type of narcotic was used, and any comments. These training records are kept not because they think it's something they should do, it's because it's something they have to do. Because they know they will be questioned on the training. They know they're going to have hearings like this where the certifications are going to be questioned because we need to know. What was the district court's finding with respect to this evidence that nobody ever failed? Was there a specific finding? Yes, Your Honor, the court found that the training was appropriate and the dog was, in fact, reliable. Could we move on to the question of the long ride to the Roybal building? Yes, Your Honor. To resolve this appeal, do we need to decide whether Olotoa was interrogated in the car in violation of his Miranda rights? My understanding of the record is that Olotoa did not make any incriminating statements in the car and only challenges whether his Miranda waiver and confession were voluntary. Is that right? Yes, Judge Nelson, you are correct. There were findings made by the court that after his arrest and during the transportation from his residence to the DA office, it was only after three quarters of the distance when Olotoa, the defendant himself, initiated the conversation with the agents. And the conversation that he initiated was based upon cooperation. He raised that issue. Olotoa was told or argues that the agents here promised that he would be home by dinner if he cooperated. Now, assuming such a promise was made and also assuming Olotoa was not made an informant, how would this affect whether his Miranda waiver and confession were voluntary? Would this amount to using a lie to coerce a defendant into confessing? Well, Your Honor, I think it's very important that we clarify just what happened on the record and it's in the government's brief that... And the court found that the defendant was not promised that if he cooperated with the agents, he would be home to see his wife and children that night. He was not promised. That's important because how can he claim that he was coerced if he wasn't promised? That is just the way that the events transpired over time. After he inquired about cooperation and they explained it to him, when he got into the elevator at the DA office and he said, you know what? I changed my mind. I want to cooperate. Only after that instance, when they were able to debrief him, confirm the fact that it was his intent to cooperate, then the question was, okay, let me call your wife because you're working with us now. We're going to release you. That's how the events transpired. And that's what was found by the court. That is the evidence in this case, Your Honor. If there's nothing more, the government believes that the reasonable suspicion was adequate, that there's probable cause for the search of that parcel, that the statement was correctly admitted, and that there was no dauber issue in this case. Thank you. Thank you. I'll give you a minute for rebuttal if you'd like. I'll submit your argument. All right, thank you. I thank both counsel for your argument this morning. United States v. Olatoa is submitted.
judges: Schroeder, D.W. Nelson, McKeown